```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
                       CASE NO. 1:23-cr-20173
 3

 4    UNITED STATES OF AMERICA,            Miami, Florida

 5         Plaintiff,                      May 30, 2024

 6            vs.

 7    JEFFERSSON ARANGO CASTELLANOS

 8         Defendant.                      Pages 1 to 30

 9    _____

10
                           SENTENCING
11            BEFORE THE HONORABLE K. MICHAEL MOORE
                   UNITED STATES DISTRICT JUDGE
12

13    APPEARANCES:

14
      FOR THE PLAINTIFF:        CLAYTON H. O'CONNOR, ESQ.
15                              Criminal Division
                                Department of Justice
16                              Human Rights
                                And Special Prosecutions Section
17                              1301 New York Avenue, NW
                                John C. Keeney Building
18                              Suite 1200
                                Washington, DC  20530
19                              clayton.oconnor@usdoj.gov

20
      FOR THE DEFENDANT:        MAEANN RENEE DUNKER, ESQ.
21                              Federal Public Defender
                                150 West Flagler Street
22                              Suite 1700
                                Miami, Florida 33130
23

24

25
```

```
 1

 2

 3    STENOGRAPHICALLY REPORTED BY:

 4
                             SHARON VELAZCO, RPR, FPR
 5                           Official Court Reporter
                             United States District Court
 6                           400 North Miami Avenue
                             Miami, Florida 33128
 7                           305-523-5356
                             Sharon_pellvelazco@flsd.uscourts.gov
 8

 9
                                  —      —      —
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (The following proceedings were had:)

2            THE COURT:  Calling case 23-CR-20173, United States

3     versus Jeffersson Arango Castellanos.

4            Counsel, state your name for the record, starting with

5     the Government.

6            MR. O'CONNOR:  Good afternoon, your Honor.  Clayton

7     O'Connor for the United States.  I am the trial attorney with

8     the Criminal Division in the Human Rights and Special

9     Prosecution Section.

10           And, here with me is my colleague, Liz Nielsen.

11           MS. FERNANDEZ:  Bertie Fernandez, on behalf of the USA.

12           THE COURT:  Good afternoon.

13           MS. DUNKER:  Good afternoon, your Honor.  MaeAnn

14     Dunker, assistant federal defender on behalf of Mr. Arango, who

15     is in custody and I believe he is on his way out.

16           THE COURT:  Good afternoon.

17           Okay.  The defendant is present.

18           Ms. Dunker, you can have a seat.

19           To start with, late this morning, maybe early

20     afternoon, I got the translation of medical records and I went

21     through them.  It seemed like a lot of it was repetitive and

22     contained information that was in the PSI, itself.

23           So, my question to you is was there a particular reason

24     why you wanted me to look at these records?

25           MS. DUNKER:  Yes, your Honor.

1        So, part of my factual objection was to the portion of

2   the PSI that describes an FBI summary of a Colombian police

3   report that summarizes the medical records.

4        And -- but, the basis for my objection was that no --

5   certainly, no disrespect or anything to the agents, I don't

6   think it was intentional from anyone; but, we have the records

7   and we can look at them directly, and that's what I would be

8   just asking the Court to consider today for my argument as to

9   that enhancement.

10       THE COURT:  Okay.  So, what -- was there something

11  specific in the PSI, the factual recitation that is

12  inconsistent with what?  The medical records?

13       MS. DUNKER:  Yes, your Honor.  So, the PSI, at

14  paragraph 73 -- sorry, your Honor.

15       At paragraphs 21 through 23 is really what I am

16  referring to; specifically, as to paragraph 21.  Those are the

17  reports that I am talking about.

18       In paragraph 21, it says the reports indicated that the

19  rape test completed by the medical facility in Colombia

20  indicated that they were sexually assaulted.

21       And, I think my point for your Honor is when we look

22  directly at the records, it is not supported.  And, I actually

23  think the Government is at least partially in agreement with me

24  as to that.

25       And, so, because the Government had filed the Spanish

1    records, I wanted the Court to have the benefit of the full

2    records with a certified English translation to make a point of

3    the --

4         THE COURT:  Okay.  Well, we can take each one of these

5    paragraphs; but, so, let me give the Government an opportunity

6    to respond to that.

7         MR. O'CONNOR:  Thank you, your Honor.

8         THE COURT:  If there is inconsistency, you have had an

9    opportunity to look at these medical records.

10         MR. O'CONNOR:  Yes, your Honor.  And, granted, this is

11    a little bit of a confusing point.  We addressed some of it in

12    footnote two of our sentencing memorandum.  And, you know, I

13    apologize for dumping that all in a footnote.

14         At the end of the day, we agree that the medical

15    records do not have any objective evidence corroborating the

16    victims' claim; however, I know that the PSI was referring to

17    reports, and there are law enforcement reports that perhaps

18    mistakenly say that the medical records or the medical

19    professionals had confirmed a sexual assault, that their law

20    enforcement reports indicating that is included in the

21    discovery that we provided to defense and to probation.

22         We agree with defense that that was likely mistaken.

23    The medical reports, themselves, do not provide corroborating

24    evidence; but, there are law enforcement reports suggesting

25    that -- saying that they do.

1          And, there is a bit -- I apologize for interjecting

2    again.  There is one bit in the medical records that, upon

3    reading it, you can see where that inference might be drawn.

4    It is in the diagnosis section that indicates, but there is

5    some lack of clarity, even in that diagnosis section,

6    indicating whether the doctors' review of the patients

7    corroborated a sexual assault.

8          MS. DUNKER:  Your Honor, if I may, I am happy to walk

9    you through, I think, my understanding and argument on that

10   point with the page numbers, if it would be helpful.

11         I think what the Government is referring to is at Pages

12   73 and 78 of the translation, the English translation I

13   provided.

14         And, it is underneath the diagnosis section.  And, I

15   think what we can see there is that there is an impression

16   recorded by a doctor --

17         THE COURT:  Is this on Page 73?

18         MS. DUNKER:  Yes.  And, when I say 73, it is referring

19   to the number at the top right-hand corner of the medical

20   records; so, the page numbers that were actually recorded by

21   the doctors on the records.

22         And, in those pages, your Honor --

23         THE COURT:  Is his diagnosis?

24         MS. DUNKER:  Yes, your Honor.

25         THE COURT:  It says his diagnosis is sexual battery

1    with bodily force.

2         MS. DUNKER:  Yes, your Honor.  And, at the end of that

3    diagnosis, we can see there's a notation that says,

4    "impression."

5         And, I think where my objection falls is that in other

6    places of the medical records, for example, on Page 47-1, we

7    can see that the doctors notate when a diagnosis is confirmed

8    and when a diagnosis is an impression.

9         I think the records do support that, you know, a doctor

10   might record an impression based on reported symptoms, do

11   testing and then go back into the records and note when it is

12   confirmed, versus when it is an impression.

13        And, that comparison case again, your Honor, is at

14   Page 47-1 of the records, where we see a diagnosis section for

15   victim LG, and we can see, within that section, on Page 47-1,

16   there are two diagnoses that are listed as confirmed at the

17   end.  And, there is one diagnosis that is left as just an

18   impression.  And, I think that supports my point for your Honor

19   that there is a difference between when someone comes in to a

20   doctor, reports their symptoms, reports their suspicions; a

21   doctor might write down what their initial thought is, at that

22   point, and that is different than when we have tests, we have a

23   rape kit.  We have -- you know, the whole process that I think

24   was undertaken at the hospital did not result in that confirmed

25   diagnosis being reflected in the records.

1              THE COURT:  Okay.

2              Does the Government agree with that?

3              MR. O'CONNOR:  Yes, your Honor.

4              THE COURT:  Does that take care of paragraph 21, 22,

5      and 23?

6              Were they all the same, grouped together in that?

7              MS. DUNKER:  That's right, your Honor.

8              I think my main factual objection was whether the

9      records confirmed that they were sexually assaulted.  And, I

10     think, if your Honor is agreeing with me on that, or if the

11     parties are in agreement, I guess I would request that be

12     removed from the PSI.

13             THE COURT:  Well, let me -- because at paragraph 23, at

14     the -- I guess the second to last sentence in there, "Male DNA

15     was present in the pubic, penile, scrotal, anal, peritoneal,

16     and both left and right hand fingernails scrapes and

17     clippings."

18             Was that a -- that doesn't sound to me like that is an

19     impression.  I mean, that is a finding.

20             MS. DUNKER:  Your Honor, I would like to direct you to

21     the next sentence in that same paragraph.  What it says is, it

22     notes "there was no DNA typing results, unlike EL."

23             And, I think the inference we can make from that is

24     that the DNA didn't match a profile other than the victim.  So,

25     in other words, I think it was his own DNA there.

1          And, those DNA reports, your Honor, I will just note

2    were taken from August -- I believe, in the United States, from

3    the FBI or from the medical army center.

4          THE COURT:  Okay.  All right.

5          So, did you want to make any changes to the PSI?

6          MS. DUNKER:  Your Honor, I would request that

7    paragraph 21 be removed, if we are all in agreement that the

8    medical records do not support that the victims were sexually

9    assaulted.

10          THE COURT:  And Government?

11          MR. O'CONNOR:  We only note that Probation was correct

12    to note it, in that there were police reports that indicated,

13    perhaps mistakenly, that there was a confirmation of a sexual

14    assault.

15          We are not relying on that as part of our argument.

16          And, overall, don't have an objection to removing it,

17    given the basis was a misunderstanding; but, just to indicate

18    that that was in the materials, and Probation was not wrong for

19    reporting that.

20          THE COURT:  Okay.  So, you want -- you agree to delete

21    paragraph 21?

22          MR. O'CONNOR:  Yes, your Honor.

23          THE COURT:  Okay.

24          MS. DUNKER:  So, your Honor, I think that if we are

25    leaving it in the PSI, I guess I would request that we add that

1  the medical records don't -- don't support that the victims

2  were sexually assaulted.

3        I think the inference from that paragraph is that the

4  hospitals did confirm it, and I think we are all in agreement

5  here that is not the case.

6        MR. O'CONNOR:  And, we are fine removing it, your

7  Honor.

8        THE COURT:  So, removing paragraph 21.

9        MS. DUNKER:  Thank you, your Honor.

10        THE COURT:  Okay.  All right.

11        Any other objection?

12        MS. DUNKER:  I think my -- if we have settled the

13  medical records, I just have argument for the Court.

14        THE COURT:  Well, if that takes care of the -- that

15  takes care of all your objections.

16        So, the total offense level remains 41, criminal

17  history Category 1, and guideline range of 324 to 405 months.

18  Is that a correct calculation of the guidelines?

19        MS. DUNKER:  Without sustaining my objections, yes,

20  your Honor.

21        THE COURT:  Well, that is what I am saying.

22        What were your other objections?

23        MS. DUNKER:  I'm sorry, your Honor.  Can I have the

24  opportunity to be heard on my argument for the sexual assault

25  enhancement?

1        THE COURT:  Yes.

2        MS. DUNKER:  Okay.  Thank you, Judge.

3        I think, having cleared up that the records,

4   themselves, do not support it, what we are left with are

5   statements.

6        THE COURT:  Right.

7        MS. DUNKER:  And, I certainly do not blame the victims

8   at all for waking up and being scared, angry, having been

9   drugged and not remembering what happened to them that night.

10       But, you know, the records that we do have that we

11   provided to your Honor, I think, give us an account and show us

12   what isn't there, that perhaps should be there, in order to

13   sustain this enhancement.

14       The records show you that on March 6, 2020, both

15   victims reported to the hospital and, at that time, no one

16   mentioned anything about a sexual assault.  There was no

17   mention of pain in the anal area.  There was no suspicion of

18   sexual abuse.  There was no sexual assault protocol that was

19   performed.

20       Three days later, on March 9th of 2020, that's when the

21   victims returned to the hospital and, for the first time,

22   reported these symptoms.

23       And, I reference the Court, that is on Page 63 of the

24   medical records.

25       As to victim LG, he returned because the second victim

1    had come in and reported these concerns about pain in the area.

2            But, it is undisputed that neither of the victims could

3    remember what had happened to them.  Neither of them were able

4    to tell the doctors that they were sexually assaulted.  The

5    only thing we have here is them coming in and having pain in

6    that area.

7            But, beyond that, you know, we don't have any objective

8    evidence to support this enhancement.  We just have their

9    statements.  And, we only have those statements three full days

10   after the kidnapping happened.

11           The records also show us what isn't there, that I think

12   should be there, which is if a sexual assault occurred, there

13   is no notation of tearing in the anal area.  There is no

14   sexually transmitted infections.  There is no unexplained

15   bleeding, no signs of anal trauma.  None of those things that

16   would be present, would have been noted inside the records if

17   this had occurred.

18           And, I think, your Honor, without relying upon the CMP

19   reports, that is really all we are left with.

20           There has been no admission from any of the defendants

21   that this happened.  And, you know, even at one point in the

22   records and the doctor's note that "EL complains of anal pain,

23   but that 'it is not clear whether he was a victim.'"

24           That is at Page 73-1 of the translation of the medical

25   records.

1          And so, in sum, your Honor, the victims aren't able to

2     remember, aren't able to confirm what happened to them.  The

3     doctors are not clear that they were victims of a sexual

4     assault.  And, similarly, this Court should find the Government

5     can't meet its burden in proving that a sexual assault

6     occurred, by a preponderance of the evidence

7          THE COURT:  So, this is paragraph 73 that you are

8     objecting to, the six-level enhancement?

9          MS. DUNKER:  Yes, your Honor.

10          THE COURT:  All right.  Anything from the Government in

11     response?

12          MR. O'CONNOR:  Thank you, your Honor.

13          And, we addressed, you know, the defendant's defenses

14     and our response to that in our sentencing memorandum.  Only to

15     say that because of the nature of the crimes and how the

16     defendant carried out the crimes by drugging the victims such

17     that they don't remember, when they did first go to the

18     hospital on March 6, they didn't know to report it.

19          It is -- and, because of how they were drugged is the

20     reason they can't recall what happened during the kidnapping.

21     When they did first recognize it on March 7th, they talked

22     about it amongst themselves.  And, one of the victims even

23     recognized a substance that it was not like water, more like

24     semen when he was taking a shower.

25          And, it is critical to put that into context.  He was

1    in the shower, again, likely washing away the evidence when he

2    first realized what he believes happened.

3           The Government has been clear that the evidence of the

4    sexual assault rests on the victims' statements and

5    observations of their body.  By the time they were able to be

6    examined by this, it is not like the evidence should be there.

7    It is reasonable that it wasn't there, given the amount of time

8    that lapsed before they knew to even make the claim, or knew to

9    see the doctors for an examination.

10          So, given the context of how this happened, the victims

11   both recognizing the soreness not just in any area, but in a

12   specific area, we believe that their statements and

13   observations are sufficient to enforce the -- to meet the

14   preponderance of the standard that applies to the sexual

15   assault enhancement.

16          THE COURT:  I can't tell you where exactly I saw this,

17   whether it was in the PSI or in your response.  But, did I see

18   a reference to one of the victims noting that the victim had

19   found or noticed what appeared to be semen in his stool?

20          MR. O'CONNOR:  It was while he was taking a shower, and

21   coming out of his anal region.  That is in his statement.  We

22   provided that as an attachment.

23          THE COURT:  All right.  That is in his statement.

24          MR. O'CONNOR:  It may be in the PSI, itself.  I can't

25   recall specifically.  But, we did provide the statement in the

1    attachments.

2           THE COURT:  All right.

3           So, any further argument on that?

4           MR. O'CONNOR:  Not from the Government.

5           MS. DUNKER:  I think -- your Honor, I know the Court

6    knows the standard here; but, again, I certainly don't fault

7    the victims at all.  But, there is a burden here.

8           THE COURT:  Right.

9           MS. DUNKER:  They have to bring, your Honor, evidence

10   that this happened.  We can't prove a negative, and it is not

11   that they had the opportunity to do this, that we all associate

12   having drugs in your drink with a sexual assault.  I think many

13   of us in this room know not to leave our drinks unattended when

14   you are at a bar.

15           There is no evidence that that happened, and there is

16   certainly no evidence that semen was coming out.

17           I think the statement from the victim was there was

18   something that felt like semen.  But, there is just nothing in

19   the records to support -- support that statement.

20           THE COURT:  Well, a couple of things; first of all, I

21   understand wanting to dissect exactly what the medical records

22   do and don't say.

23           And, we are agreeing that there was no scientific or

24   diagnosis, medical diagnosis.  But, that being said, and, given

25   the preponderance of the evidence standard, I think you are

1   asking for too high a bar to be met in order to establish the

2   sexual assault, based on other circumstantial evidence.

3          So, one, I will note the objection, and deny it based

4   on the cumulative evidence, including the statements of the

5   victims and the impressions of the doctor, even though it's not

6   a diagnosis.

7          But, let me say this for -- just for clarity's sake;

8   that, in the event that this particular issue is preserved and

9   raised on appeal, it would be the Court's intention to

10  pronounce an alternative sentence, post Booker, that is a

11  reasonable sentence based on all the circumstances in this

12  case, and that sentence would be the same as the guideline

13  sentence.  I'm noting your objection and denying it.

14         So, the 11th Circuit has the benefit of knowing what

15  this Court would sentence this defendant to, in any event, even

16  if the objection to the sexual enhancement was determined to be

17  an error.  Okay?

18         Your next objection?

19         MS. DUNKER:  Yes, your Honor.

20         Our next objection is to the leader organizer

21  enhancement.  And, I will largely rest on my pleadings for this

22  one.  But, I think I will note the highlights of that point

23  were that the victims -- or that the codefendants equally

24  shared the profits from the scheme.  They think -- the PSI does

25  a nice job of laying out each one of them had an integral role

1    in the scheme.  One of the codefendants was responsible for

2    recruiting other people to be a part of it.

3          One codefendant was responsible for having contacts in

4    order to spend the money that was stolen from the victims.

5          And, you know, third, your Honor, of course, there was

6    the role of the defendant, who -- placing the drugs in the

7    drink.  But, each one of them had an important role that could

8    not have been replaced by someone else.  And, as is noted, they

9    equally shared the profits.

10         One of the codefendants even noted she viewed herself

11   as equals with the two codefendants.  So, for those reasons,

12   your Honor, we don't think the leader organizer enhancement is

13   warranted here.

14         THE COURT:  Okay.

15         Any response from the Government?

16         MR. O'CONNOR:  Thank you, your Honor.

17         We also addressed this issue in our sentencing

18   memorandum.  Just to note, it is clear in the guidelines there

19   can be more than one leader, and one only needs to lead one

20   other person for the enhancement to occur.

21         We think the role the defendant plays does put him in a

22   leadership role, both through the actual acts he carried out

23   that day, being the one who carried out the drug and being the

24   one who actually duped the witness into providing a PIN number,

25   being the one who used that ATM card in various ATM vestibules

1    throughout the day.

2         It is not to say that the co-conspirators didn't have a

3    role.  They did.  But, he demonstrated a leadership role.

4         But, even more so, in their continued investigation of

5    this, when law enforcement had a, you know, judicially approved

6    wire on the defendant's phone, there were a number of phone

7    calls that showed that he was playing a leadership role.

8         He was directing the co-conspirators where to go to do

9    recognizance on other places where they could carry out the

10   scheme, directing co-conspirators to be ready for committing

11   certain acts so they could get out and go work again.

12        And, we think that those were the directions

13   corroborating and further enhancing his leadership role amongst

14   the three of them.

15        THE COURT:  Well, with the exception of paragraph 21,

16   which is not relevant to this objection, the factual

17   recitations have not been contested, beginning at paragraph 9,

18   Page 5 of the Presentence Investigation Report, all the way

19   through to paragraph 54, Page 14 of the Presentence

20   Investigation Report.

21        And, based on my review of those --

22        MR. O'CONNOR:  Your Honor, I apologize for cutting you

23   off.  I think, relating to this specific issue, you may also

24   want to account for the second addendum that lays out

25   additional facts relevant to the organizer finder.

1          THE COURT:  We will include that, as well.  But, those

2     undisputed facts are sufficient to satisfy the enhancement for

3     being an organizer or leader.

4          But, as with the prior objection, I will note that in

5     the event this objection is preserved for appellate review,

6     that the sentence imposed today by the Court would be a

7     sentence imposed not only under the guidelines, but a

8     reasonable sentence, post Booker, so that the appellate court

9     has the benefit of knowing what the district court would

10    sentence to in the event that that enhancement were determined

11    to be unsupported.

12          Okay.

13          Next objection?

14          MS. DUNKER:  Yes, your Honor.

15          My final objection is to the other arrest section of

16    the PSI, and that is paragraphs 98 through 104.

17          And, I want to make it clear that I'm not contesting

18    that your Honor can and should determine -- determine and

19    consider my client's arrest, even if it's a foreign

20    jurisdiction.  I am not contesting that.

21          What I am taking issue with is the PSI, I guess,

22    Googling my client and finding a foreign news article, which I

23    presume to be in Spanish, that has not been provided, has not

24    been translated, has not been verified, in order to support the

25    other arrest section of the PSI.

1        We have the extradition documents.  We know Mr. Arango

2   was serving another sentence in Colombia.  But, I think I would

3   just take exception to including foreign news articles that we

4   just don't have a way to verify or look at or read in English,

5   to be included there.

6        And, secondly, as to statements from psychological

7   records, I think, in the addendum, there was some more context

8   that was provided for those statements, which I appreciated;

9   but, again, I think it is an inappropriate source of

10  information for the other arrest section of the PSI, again,

11  when we do have the records that are already listed out with

12  the extradition documents in the record.

13       THE COURT:  Well, paragraphs 98 through 104, none of

14  them were a basis for calculating the guideline range; is that

15  correct?

16       MS. DUNKER:  That is right.

17       THE COURT:  Okay.  And, to that extent, I am not going

18  to delete it; but, I will tell you, for sentencing purposes,

19  that I will not rely on them, in any event, in terms of either

20  calculating the guidelines or where, within the guideline

21  range, I would sentence.  Okay?

22       MS. DUNKER:  Yes, Your Honor.

23       THE COURT:  Next objection?

24       MS. DUNKER:  Those are all my objections, your Honor.

25  Thank you.

1        THE COURT:  On that basis, the Probation Office has

2  calculated an offense level of 41, with a guideline range of

3  324 to 405 months.

4        Is that a correct calculation of the guidelines?

5        MS. DUNKER:  Without waiving our objection; yes, your

6  Honor.

7        THE COURT:  Mr. Castellanos, do you want to say

8  anything on your own behalf before sentence is imposed?

9        THE DEFENDANT:  I would like to apologize to God, and

10  apologize to the victims.

11        And, that is all, your Honor.

12        THE COURT:  Thank you.

13        Anything on his behalf?

14        MS. DUNKER:  Yes, your Honor.

15        We are requesting, understanding the Court has

16  overruled our objections, we are requesting a sentence of

17  210 months that would represent the high end of the guideline

18  range if your Honor had sustained our objection to the sexual

19  assault enhancement.

20        And, I think, your Honor, I am asking you to take

21  account of a few things.

22        No matter what your Honor's sentence is today, first,

23  due to the nature and circumstances of the offense, we

24  certainly don't contest that this is serious, that it was

25  traumatic for the victims.  I would just ask the Court to

1    consider that I think it is undisputed that Mr. Arango didn't

2    target these victims because they were military members.

3          Obviously, nobody deserves to be put through what the

4    victims were.  But, I would just ask the Court to consider that

5    in determining what the appropriate sentence is.

6          I would also ask the Court to consider the history and

7    characteristics of Mr. Arango.  The PSI outlines in detail at

8    paragraphs 121 through 137 the different mental health and

9    competency issues that have been present throughout this case,

10   and have also gone largely untreated for most of Mr. Arango's

11   life.

12         The Court can also see that, you know, Mr. Arango's

13   personal story is certainly nothing short of tragic.  He has

14   lived a life of poverty.

15         He, himself, is a victim of sexual assault as a child.

16   And, I think that has developed into some very serious mental

17   health concerns that have impacted the course of this case, as

18   your Honor knows, because it has been pending for a while, and

19   has certainly been present in his life prior to the instant

20   offense.

21         I think, your Honor, I would also ask you to consider

22   that in many ways, a life of stealing is really all he has ever

23   known.  His father, as your Honor can see, was murdered when

24   Mr. Arango was nine.

25         His father grew up as somebody who stole from other

 1    people.  And, I don't say that to excuse Mr. Arango's conduct.

 2    But, this is kind of the only life he has ever known.

 3           And, I would just ask the Court, I think, to consider

 4    the circumstances of how he was raised, in determining the

 5    appropriate sentence here.

 6           I would also ask the Court to consider efficiency.

 7           As we have noted, Mr. Arango is serving a very lengthy

 8    sentence in Colombia.  And, your Honor, I would ask that you

 9    consider that in figuring out, really, who is going to pay for

10    the very long prison sentence he is going to do.

11           He will certainly do a long sentence here in the United

12    States; but, he also has a long sentence to serve in Colombia.

13    And, I think, considerations of the efficiency and figuring out

14    who is going to pay for the just punishment would merit a lower

15    sentence here.

16           And, I think, lastly, your Honor, I -- I know the

17    Government today is asking for at least 360 months.  And, I

18    think I just want to direct the Court to some other cases that

19    your Honor has had where 360 months was imposed.  And, just a

20    couple that I pulled and, of course, I recognize each case has

21    its own facts and circumstances.

22           But, in U.S.A versus Burns, Case 09-cr-10459, a

23    production of child pornography case, a sentence was greater

24    that 360 months.

25           In the case of U.S.A versus Harding, 10-CR-14099,

1    sexual exploitation of a child for the purpose of producing

2    child pornography, your Honor gave a sentence longer than

3    360 months.

4         And, I think I just wanted to anchor the Court here

5    to -- again, not to minimize or excuse his conduct here, but I

6    think to give the Court a picture of the other cases where that

7    long of a sentence has been imposed.

8         THE COURT:  Did you look at other cases I have

9    sentenced where victims were actually sexually assaulted --

10   drugged and sexually assaulted?

11        MS. DUNKER:  Not prior to today, your Honor, no.

12        THE COURT:  Because I -- I know of at least one that is

13   similar to that, where they received consecutive life

14   sentences; just for your benefit.

15        MS. DUNKER:  And, of course, your Honor knows your

16   sentencings much better than I do.

17        I don't mean to say that.

18        I think -- I just wanted to provide a little bit of

19   context for what I think is going to be a very lengthy

20   sentence -- in, your Honor, helping you figure out what would

21   be the right number today.

22        THE COURT:  Thanks.

23        Anything from the Government?

24        MR. O'CONNOR:  Thank you, no.  Not much to add other

25   than what we already addressed in our sentencing memorandum,

1   only to reiterate, which the Court is already well aware of the

2   significance of the crimes here, and that they did have a real

3   effect -- it is not a fiction of what happened.

4        There were victims, two victims which -- who elected to

5   make a statement and can explain to you the real negative life

6   consequences that he suffered ranging from, you know, his own

7   mental health issues as a result of this, and stunted a -- what

8   had been a very successful career that was stunted as a result

9   of this.  Strained relationships, you know, personal strained

10  relationships -- this wasn't an offense that was an opportunity

11  that only lasted through the course of one day, for this

12  victim.

13       Those effects have been long-lasting and significantly,

14  negatively consequential.

15       We ask the Court to consider that, as we are already

16  aware that the Court is going to, in sentencing, with the

17  recommendation that the Government has asked for.

18       THE COURT:  Thank you.

19       The Court has consider the statements of all parties,

20  the presentence report which contains the advisory guidelines

21  and statutory factors as set forth in Title 18 United States

22  Code Section 3553(a).

23       It is the finding of the Court that the defendant is

24  not able to pay a fine.

25       Is there any -- is there a restitution in this case?

1       MR. O'CONNOR:  Your Honor, there is, and restitution

2   was actually an issue that was addressed in the PSI.

3       The Government is asking for a restitution amount of

4   25,000 -- $24,115, which is the amount of the personal

5   possession that the victim -- that was taken from the victim,

6   as well as income he lost from having his TDY -- his, you know,

7   military orders to Colombia cut short by an order of four to

8   five months had a financial consequence to him.

9       These are addressed in the PSI.

10      There is also another, larger sum that the Government

11  is not asking the Court to impose in regards to restitution,

12  but we are asking for the $24,115.

13      THE COURT:  Was that 1-1-5 or 1-5-0?

14      MR. O'CONNOR:  It is 1-1-5.

15      THE COURT:  Is that in dispute?

16      MS. DUNKER:  No, your Honor.

17      THE COURT:  Okay.  So, we will go ahead and impose

18  restitution in the amount of $24,115.

19      It is the judgment of the Court the defendant,

20  Jeffersson Arango Castellanos, is committed to the Bureau of

21  Prisons for 585 months.  This term consists of 405 months as to

22  Counts 1 through 3; 60 months as to Count 4, to be served

23  consecutively to Counts 1 through 3; and, 120 months as to

24  Counts 5 and 6, to be served consecutively to Counts 1

25  through 3 and Count 4.

1       Upon release from imprisonment, defendant shall be

2  placed on supervised release for a term of three years.  This

3  term consists of three years as to Counts 1 through 6, all

4  terms to run concurrently.

5       Within 72 hours of release from the custody of the

6  Bureau of Prisons, the defendant shall report in person to the

7  Probation Office in the district where released.

8       While under supervision, the defendant shall comply

9  with mandatory and standard conditions of supervision, as

10  referenced in Part F of the presentence report.

11       Defendant shall also comply with the following special

12  conditions:  Surrendering to Immigration for removal after

13  imprisonment; financial disclosure requirement; no new debt

14  restriction; mental health treatment; substance abuse

15  treatment; permissible search; association restriction; and

16  unpaid restitution, fines, special assessments as noted in Part

17  F of the presentence report.

18       The defendant shall pay immediately to the United

19  States a special assessment of $100 as to each of Counts 1

20  through 6, for a total of $600.

21       So, the total sentence is 585 months imprisonment,

22  three years supervised release, restitution in the amount of

23  $24,115, and $600 special assessment.

24       And, as I noted before, the sentence imposed is the

25  sentence within the applicable guideline range; but, it is also

1    a sentence to be imposed, post Booker, as a reasonable sentence

2    after consideration of the 3553(a) factors, including the

3    nature and circumstance of the instant offense, the history and

4    characteristics of the defendant, the need to promote specific

5    and general deterrence, and the need to promote respect for the

6    law.

7         Now that sentence has been imposed, does the defendant

8    or his counsel object to the Court's finding of facts and/or

9    the manner in which sentence was pronounced?

10        MS. DUNKER:  Yes.  We would renew all of our previous

11   objections, written at Docket Entry 59; specifically, for the

12   record, we would object to the Court's overruling of my

13   objection to the application of the sexual exploitation

14   enhancement based on what the Government has introduced, and

15   also based on the lack of evidence that connected it to

16   Mr. Arango, or his codefendants, or that it was within the

17   joint criminal activity and foreseeable to him.

18        We would also specifically object to the Court's

19   finding as leader organizer enhancement applies to the

20   procedural and substantive unreasonableness of the sentence.

21        We would object to this as being a de facto life

22   sentence, in violation of the extradition treaty with Colombia,

23   and we would object to the Court making a King finding prior to

24   the 3553(a) factors for my client's statement.

25        THE COURT:  What was that last one?

1          MS. DUNKER:  It was to the Court making the King

2     finding prior to my allocution or to my client's statement,

3     just for the record on appeal, your Honor.

4          THE COURT:  What statement was that?

5          MS. DUNKER:  Your Honor's finding that you would impose

6     this same sentence, regardless of the objections that were

7     overruled.

8          I would object to that finding being made prior to my

9     client having the opportunity to speak, or me to allocute.

10          Just for appeal, your Honor.  Thank you.

11          THE COURT:  Okay.  All right.

12          Anything else?

13          MS. DUNKER:  Not on behalf of Mr. Arango, your Honor.

14          THE COURT:  All right.  Thank you.

15          (Proceedings concluded at 3:39 p.m.)

16                         —     —     —

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I hereby certify that the foregoing is an

 4   accurate transcription of the proceedings in the

 5   above-entitled matter.

 6

 7
     August 8, 2024        /s/Sharon Velazco
 8   DATE                       SHARON VELAZCO, RPR, FPR
                                Official Court Reporter
 9                              United States District Court
                                400 North Miami Avenue
10                              9th Floor
                                Miami, Florida 33128
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```